UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE                                                                      CASE NO.

**ROBERT L. GRANT**                                                        **07-10465**
                                                                           SECTION A
DEBTOR
                                                                           CHAPTER 7

<u>**REASONS FOR DECISION**</u>

This matter came for hearing on a Motion to Convert to Chapter 13 ("Motion to Convert")

filed by Robert L. Grant ("Debtor").  The Chapter 7 Trustee ("Trustee"), Michael Chiasson, and

New Falls Corporation ("New Falls"), a creditor in these proceedings, filed Objections to the Motion

to Convert.[1]  Both Trustee and New Falls argue that the Motion to Convert was not filed in good

faith.

### I. Jurisdiction

The Court has jurisdiction pursuant to 11 U.S.C. § 706 and Federal Rule of Bankruptcy

Procedure 1017(f)(2); this is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

### II. Facts

On March 15, 2007 ("Petition Date"), Debtor filed the current chapter 7 case ("2007

Bankruptcy").[2]  Debtor's original Schedule of Assets and Liabilities ("Schedules") listed a home in

New Orleans and a 1997 Honda CRV.[3]  He also disclosed cash, a Capital One checking account,

miscellaneous personal goods, film making equipment, film inventory, and a 1999 computer and

printer, all of minimal value.  On his Statement of Financial Affairs ("SOFA"), Debtor disclosed

---

[1] Docket Nos.  21, 34, 44, and 86.

[2] Docket No. 1.

[3] *Id.*

business activities through two sole proprietorships, Golden Gate Designs and Swedish Crystal

Imports.[4]  Although Debtor claimed Louisiana as his residence, he also claimed California

exemptions on Schedule C.[5]  Debtor filed his case under social security no. XXX-XX-1774

("#1774").  Debtor holds two valid social security numbers, #1774 and XXX-XX-7086 ("#7086").

Only #1774 was disclosed on his Petition for Voluntary Relief ("Petition").

On the Petition Date, Debtor held a check in the amount of $25,184.72 representing the

balance previously held in a Vanguard money market account.[6]  He also maintained a checking

account with Whitney National Bank ("WNB") which had a balance of $7,646.43 on the Petition

Date.[7]  Debtor was also owed $7,428.00 by Smith & Hawkins on an outstanding receivable and had

closed an account with Bank of America prior to filing.  None of these assets were disclosed on

Debtor's Schedules or SOFA.[8]  Also, his balance in the Capital One account on the Petition Date

was $2,032.95, not the $100.00 he disclosed.[9]

---

[4] *Id.*

[5] *Id.*  Debtor asserts that he has not been a Louisiana resident for the 730 days preceding filing.  11 U.S.C. §
522(b)(3)(A) provides that a debtor may exempt property under the laws of the state "in which the debtor's domicile
has been located for the 730 days immediately preceding the date of the filing of the petition or if the debtor's
domicile has not been located at a single state for such 730-day period, the place in which debtor's domicile was
located for 180 days immediately preceding the 730-day period or for a longer portion of such 180-day period than
in any other place."  In other words, if Debtor was a resident of at least two states during the two year period
preceding the filing of this case, the state of his residency for the six months preceding the two year period would
control the exemptions he could claim.  The Court finds for the Reasons set forth below, that Debtor was a Louisiana
resident from November 2004 through the Petition Date.  *Infra*, pgs 5-9.

[6] Tr. T. 52:19-53:10.

[7] Exh. 18.

[8] Docket No. 1

[9] Exh. 19.

2

In high school Debtor obtained a social security number (# 1774), which he used for various jobs in the United States.[10]   He attended college in New York City and, after obtaining his undergraduate degree,  moved to Europe where he obtained two graduate degrees, including a Ph.D. in Economics.[11]  Because he was a consultant while in Europe, Debtor testified that he never used his social security number during these years even though he worked for various European or United States companies.[12]  Debtor returned to the United States in 1969 and obtained a job with the Department of Housing and Urban Development ("HUD").  When asked for his social security number, Debtor responded that he did not have one.  HUD obtained a new social security number for Debtor, #7086.[13]

In 1995, Debtor's fortunes were not going well, and in an attempt to "change his luck," he began using his original social security number, #1774, once again.[14]  In May 1995, Debtor used #1774 to obtain a line of credit from Bank of America.[15]

Debtor filed a Voluntary Petition for Relief under Chapter 13 in the United States Bankruptcy Court for the Northern District of California on November 5, 2001, using #1774 ("2001 Bankruptcy").[16]   At the time, Debtor owned a house in Berkeley, valued on his schedules at

---

[10]  Tr. T. 7:20-8:11.

[11]  Tr. T. 8:12-20, Tr. T. 12:21-24.

[12]  If true, this raises an unrelated question concerning Debtor's failure to file tax returns or report income during this period, but the Court digresses. Tr. T. 8:14-9:8, 10:22-11:25.

[13]  Tr. T. 14:18-21, 15:3-8.

[14]  Tr. T. 19:19-20:4.

[15]  Exh. 8.

[16]  Case No.01-45914.

3

$370,000.00 and encumbered by mortgages or liens with aggregate scheduled balances of $325,000.00.[17]

On October 29, 2002, First Federal Savings and Loan obtained relief from the automatic stay to foreclose on Debtor's home when he failed to make postpetition mortgage payments.[18]  Debtor quickly listed the property for sale and within 60 days had an offer to purchase.[19]  On April 1, 2003, Debtor requested that his bankruptcy case be dismissed.[20]  He did not disclose the pending sale of his home to the Court or Trustee.  The Court dismissed the 2001 Bankruptcy on April 7, 2003, and Debtor closed on the sale of his house the next day,  April 8, 2003.[21]  Debtor sold the home for $759,000.00 and, after paying off secured claims, collected $263,000.00.[22]  Debtor did not pay any of his unsecured creditors following the sale.  At the time of his 2001 Bankruptcy filing, Debtor's schedules reflected approximately $73,000.00 in unsecured debt.[23]

In October 2004, Debtor arrived in New Orleans.[24]  He lived in a one room rented cabana for approximately four months before agreeing to purchase a home in New Orleans in February

---

[17] Exh. 10.

[18] Case No. 01-45914, Docket No. 35.

[19] Tr. T. 70:13-22.

[20] Case No. 01-45914, Docket No. 40.

[21] *Id.* at Docket No. 41; 69:17-18.

[22] Tr. T. 72:4-8.

[23] Exh. 10.

[24] Tr. T. 35:19-22.

2005.[25]  The sale closed on March 29, 2005.  Debtor funded the $287,000.00 purchase price with

a loan from Wells Fargo of $228,000.00 (obtained by using #7086) and a cash down payment of

$67,000.00.[26]  On his Uniform Residential Loan Application with Wells Fargo, Debtor represented

that the home was to be his primary residence.[27]

In the meantime, Bank of America sold its claim against Debtor to New Falls who then

brought suit for collection against Debtor in California.   On June 13, 2006, a default judgment was

entered on the record of the Superior Court of the State of California for the County of Marin against

Robert  L. Grant d/b/a Golden Gate Designs/ Swedish Crystal Imports in the amount of $23,827.71

("Default Judgment").[28]

After learning that Debtor was in Louisiana, New Falls filed a Petition to File and Make

Executory a Judgment of a Sister State in the Civil District Court for the Parish of Orleans

("Louisiana Case").[29]  After discovering New Falls' collection effort, Debtor hired two attorneys,

one to represent him in California and the other in Louisiana.[30]  In response to New Falls' lawsuits,

Debtor asserted that he was not the individual who obtained the loan from Bank of America, and as

a resident of Louisiana, he was not properly served.[31]

---

[25] Tr. T. 36:14-37:11.

[26]  The down payment and $8,000.00 in closing costs were funded with the proceeds of his California home
sale. Exh. 24;  Tr.T. 47:5-17, 117:23-118:3.

[27] Exh. 24.  The application was signed by Debtor on March 5, 2005.

[28] Exh. 42.

[29] *Id.*

[30] Tr. T. 74:5-75:6; 79:20-24.

[31] Exh. 44, 45, 46.

Based on Debtor's asserted defenses, New Falls executed a Stipulation to Vacate and Set Aside Default Judgment, which was approved by the court on October 3, 2006.[32] New Falls also dismissed without prejudice its Louisiana Case on October 11, 2006.[33] New Falls discovered Debtor's deception after Debtor filed an answer, and New Falls filed a Motion for Summary Judgment on December 18, 2006.[34] Debtor filed the current chapter 7 case four days before the scheduled hearing on New Falls' Motion for Summary Judgment.[35]

When discovery conducted by New Falls and the Trustee revealed the existence of an undisclosed Vanguard account, Debtor amended his Schedules and SOFA to disclose this information as well as the existence of the WNB account and uncashed check ("Amended Schedules"). He also filed the instant Motion to Convert.[36] Both the Amended Schedules and this Motion to Convert were filed on May 15, 2007, two months after the Petition Date and two days prior to Debtor's §341(a) meeting of creditors. Debtor attended his § 341(a) meeting of creditors on May 17, 2007.[37]

---

[32] Exh. 47.

[33] Exh. 48.

[34] Exh. 50.

[35] Docket No. 1; Exh. 50.

[36] Docket No. 15.

[37] Docket No. 23.

### III. Discussion and Law

Debtor filed the Motion to Convert pursuant to 11 U.S.C. § 706.  The relevant portions of that statute read:

> (a) The debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title.  Any waiver of the right to convert a case under this subsection is unenforceable.
>
>           *                        *                  *
>
> (d) Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter.

Both Trustee and New Falls object to the relief requested, arguing that the Motion to Convert was not filed in good faith and that conversion is another attempt by Debtor to evade paying creditors.  They argue that under *Marrama v. Citizens Bank of Massachusetts*[38] a debtor does not have an absolute right to convert from chapter 7 to chapter 13.   In *Marrama*, the Supreme Court concluded that a chapter 7 debtor, who filed schedules that falsely represented the value of a property in Maine and improperly claimed a homestead exemption for a rental property, did not have an absolute right to convert to chapter 13.  The Supreme Court reasoned that § 706(d) does not allow a debtor to convert to chapter 13 if he may not be a debtor under that chapter, and § 1307(c) allows a court to dismiss a case "for cause."  Reasoning that a court can dismiss a bankruptcy case filed in bad faith, the Supreme Court found that a conversion may also be denied if requested in bad faith.

 The Supreme Court  concluded:

> [N]othing in either § 706 or § 1307(c) (or the legislative history of either provision) limits the authority of the court to take appropriate action in response to fraudulent

---

[38] *Marrama v. Citizens Bank of Massachusetts*, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007).

7

conduct by the atypical litigant who has demonstrated that he is not entitled to the relief available to the typical debtor.[39]

Debtor bears the burden of proving that he filed the Motion to Convert in good faith.[40] The totality of the circumstances is considered when weighing whether or not good faith exists.[41] The following nonexclusive factors have been considered relevant to this decision:

> 1) whether the debtor is seeking to convert to chapter 13 in good faith (including a review of facts such as the timing of the motion to convert; the debtor's motive in filing the motion; and whether the debtor has been forthcoming with the bankruptcy court and creditors);
> 2) whether the debtor can propose a confirmable chapter 13 plan;
> 3) the impact on the debtor of denying conversion weighed against the prejudice to creditors caused by allowing conversion;
> 4) the effect of conversion on the efficient administration of the bankruptcy estate; and
> 5) whether conversion would further an abuse of the bankruptcy process.[42]

This Court finds, like the debtor in *Marrama*, that Debtor is atypical and not entitled to the relief available under chapter 13. The record is full of facts that support this conclusion.

### A. Does Good Faith Exist?

There are a number of key events that have helped this Court conclude that Debtor did not file the Motion to Convert in good faith.

---

[39] *Id*. at 1111.

[40] *See, In re Piccoli*, 2007 WL 2822001, at *7 (E.D.Pa. 2007).

[41] *Id*. at *7.

[42] *Id.* at *7, *citing In re Pakuris*, 262 B.R. 330 (Bankr. E.D.Pa. 2001) and *In re Lilley*, 91 F.3d 491 (3d Cir. 1996); *see also, In re Beard*, 84 F.3d 431 (5th Cir. 1996).

## 1. Two Social Security Numbers

Debtor has held two social security numbers for nearly fifty-five (55) years. The existence of two social security numbers has allowed Debtor to evade creditors and the consequences of his own checkered financial history for over a decade.  Debtor obtained his first social security number (#1774) when he was in high school and used it until he graduated from college.  After college, Debtor moved to Europe for eight years and  completed two graduate degrees.  Upon returning from Europe in 1969, Debtor obtained a new social security number (#7086).  Debtor's reasons for doing so are conflicting.

Debtor initially testified that he did not think he had a social security number.[43]  Debtor also testified that he thought his number had expired.[44]  Then Debtor testified that he got a new number because he could not remember his prior number.[45]  Next, Debtor testified that he did not realize that he had two social security numbers until his sister found his first card (#1774) in 1983.[46]  Finally, Debtor testified that he knew he had two numbers, but believed that the first one was invalid because he did not know where his card was stored.[47]

---

[43] Tr. T. 13:15-18.

[44] Tr. T. 13:20-14:7.

[45] Tr. T. 18:5-13.

[46] Tr. T. 15:15-21.

[47] Tr. T. 19:2-12.

In any event, sometime after finding his original card, Debtor contacted the Social Security

Administration who verified that the original number was still valid.[48] Debtor testified that in 1995,

> Because business was the way it was, and because in the San Francisco Bay [sic] are about renewing things, ideas personalities *et. cetera*, I decide [sic] that I was going to change my luck and I was going to discontinue using 7086 and I was going to use 1774.[49]

The Court takes Debtor at his word.  In 1995, Debtor elected to use #1774 in an effort to free himself

from less than desirable business circumstances and presumably bad credit.  By using his original

social security number, Debtor attempted  to "change his luck" by switching identities.

In April 1995, Debtor obtained an unsecured line of credit from Bank of America using

#1774.[50]  At the time this loan was obtained, Debtor also maintained an account with Bank of

America under #7086. Debtor offered this testimony as evidence that Bank of America was at all

times aware that he utilized two different social security numbers.  It appears from the evidence

submitted that the other "relationship" Debtor held with Bank of America consisted of a depository

account.  No proof was offered that Bank of America knew that the Robert L. Grant #1774 was the

same Robert L. Grant #7086.  Given that it was Debtor's stated intention to leave his financial

history behind, it is not difficult to conclude that Debtor misled Bank of America into believing that

Robert L. Grant #1774 was a different individual from Robert L. Grant #7086.

---

[48] Tr. T. 19:21-25.

[49] Tr.T. 19:25-20:4.

[50] Exh 8.

Debtor obtained the Bank of America loan for the purpose of funding a business venture called Golden Gate Designs/ Swedish Crystal Imports. The loan was taken out in Debtor's name. The line of credit was fairly minimal, $15,000.00.[51]

Debtor ultimately defaulted on this debt and was pursued by Bank of America. Sometime later, New Falls acquired the claim against Debtor and continued to pursue collection. In August 2006, after New Falls had obtained its Default Judgment and moved for execution in Louisiana, Debtor moved to vacate the judgment on the ground that Debtor was not the borrower.[52] New Falls advised Jessie Elliott, Debtor's Louisiana counsel ("Elliott"), that a credit report showed the existence of two social security numbers, both held by Debtor. Elliott asked Debtor to confirm that this was not the case. Rather than disclose the truth, Debtor obtained a credit report under #7086 and forwarded it to Elliott.

Email correspondence between Elliott and Debtor reveals that Elliott's question regarding Debtor's use of two social security numbers provoked the following response:

> I obtained a copy of my credit report and there was no listing of a second social security number. I have had several credit checks in the last years [sic] and there has never been a listing of a second number in my report.[53]

Debtor's response concealed that he did in fact have two social security numbers and that he was the borrower on the loan. Based in part on this misrepresentation, Elliott continued to assert a

---

[51]   *Id.*

[52]   Debtor raised other defenses including improper service due to residency in Louisiana, which will be discussed later.

[53]   Exh. 54.

mistaken identity defense, and New Falls voluntarily vacated its Default Judgment[54] causing it additional delay and costs of collection.

Debtor also concealed his second social security number on his Petition in this case.[55]  At the hearing on the Motion to Convert, Debtor asked the Court to consider the fact that only two creditors would be affected by the conversion, New Falls and a second small claim.[56]  While the bar date has passed, Debtor's history of utilizing multiple social security numbers, particularly when in financial distress, raises concerns that Debtor's failure to disclose his second social security number on his Petition omits an important detail necessary for creditors to locate and participate in this case. For example, Wells Fargo advanced money to Debtor in 2005 under #7086, yet Debtor filed his 2007 Bankruptcy under #1774.  While Debtor listed Wells Fargo in both his Schedules and on his mailing matrix, the Court is not  confident that all creditors have been similarly listed and notified of this case.

It is apparent to this Court that Debtor intentionally misled Bank of America, New Falls, Elliott, and the Louisiana state court regarding his identity.  Debtor's failure to disclose both social security numbers on his Petition supports the conclusion that Debtor is still attempting to conceal his true financial identity from his creditors and this Court.[57]

---

[54] Exh. 47.

[55]  Docket no. 1.

[56] Tr. T. 63:17-25.

[57]  As of the date of this Opinion, Debtor still has not amended his Petition to disclose his second social security number, nor has he notified creditors of its existence.

### 2. 2001 Bankruptcy

The facts concerning Debtor's 2001 Bankruptcy also raise serious doubts about Debtor's motives in this case. In the 2001 Bankruptcy, Debtor listed real property valued at $370,000.00, $325,508.44 in secured debt, and $73,189.88 in unsecured debt.[58] When Debtor fell behind with his home-mortgage payments, his lender obtained relief from the automatic stay, allowing it to foreclose.[59] On April 1, 2003, Debtor filed a Motion to Dismiss his bankruptcy case which was granted. The 2001 Bankruptcy was dismissed on April 7, 2003.[60] The following day, Debtor sold his property for $759,000.00, netting approximately $263,000.00 over and above the secured debt.[61] With unsecured debt totaling $73,189.88, Debtor could have easily paid off his unsecured creditors. Instead, he chose to pay off previously unscheduled debts to relatives and keep any remaining funds for his personal use.[62]

Debtor spent the proceeds of the sale as follows: $54,000.00 funded his daughter's college education; $20,000.00 repaid his ex-wife for high school tuition she advanced for their daughter; $8,000.00 repaid his brother on an alleged loan; and $12,000.00 was paid to other family members.[63] Debtor deposited the remaining funds in the Vanguard account.[64]

---

[58] Exh. 10.

[59] Exh. 9; Docket No. 39.

[60] *Id.* at Docket No. 41.

[61] Tr. T. 145:7-11.

[62] Tr. T. 144:10-145:11; 165:2-168:25.

[63] Tr. T. 164:24-168:25; 144:19-145:8.

[64] Exh. 24. As of March 4, 2005, approximately $161,000.00 was still on deposit with Vanguard.

When Debtor was questioned regarding any payments made to creditors following the dismissal of his 2001 Bankruptcy, he could not recall a single instance in which he had paid all or part of even one claim.[65]  A comparison of the schedules filed in both bankruptcy cases reveals that almost all of the creditors scheduled in Debtor's 2007 Bankruptcy were also listed in the 2001 Bankruptcy and for the exact same amounts.  Given Debtor's inability to recount even the partial satisfaction of any of these claims, the Court concludes that Debtor failed to make any payments on his debts in the intervening four years since dismissal of the 2001 Bankruptcy.

Debtor's request to dismiss the 2001 Bankruptcy once he had received a substantial offer to sell his home, rather than pay creditors, is evidence of his unwillingness to face his financial obligations.  After receiving the benefits of an eighteen month stay, Debtor chose to pocket almost four times the amount necessary to completely pay claims.[66]

Debtor's prior conduct in connection with his previous case and sale of his home are indicative of a person who seeks to avoid satisfying claims.  His conduct concerning New Falls is evidence of just how far Debtor went to carry out this goal.

### 3. New Falls Litigation

After New Falls secured its Default Judgment, it sought to make that judgment executory in Louisiana.  Debtor was served and responded with two defenses.  His first defense claimed that he was not the borrower on the New Falls loan because the social security number which appeared on the loan application (#1774) did not match his social security number (#7086).  Debtor's California

---

[65]  Tr.T. 72:15-19; 155:24-156:3.

[66] Tr. T. 48:6-8.

14

counsel, Scott Slomiak ("Slomiak"), wrote New Falls on August 23, 2007, demanding that New

Falls immediately cease collection efforts against Debtor because:

> We have reviewed the documents provided and have confirmed that our client is not the "Robert L. Grant" who entered into the loan agreement with your client's predecessor in interest, Bank of America....First, our client has always gone by the name of Robert Lee Grant.  He has a different social security number than the number set forth on the loan application, has never lived at the address reflected on the application and has never done business as Golden Gate Designs/ Swedish Crystal Imports. Moreover, he did not apply for or receive the loan which is the subject of the collection suit.[67]

Debtor was copied on this correspondence.

In response, New Falls' attorney relayed to Elliott, Debtor's Louisiana counsel, that a credit

report on Debtor showed the existence of two social security numbers. As previously discussed,

Elliott questioned Debtor about  New Falls' allegations.[68]  In response to Elliott's questioning,

Debtor evaded addressing the real issue, his possession of two social security numbers and the fact

that he was the borrower on the debt.  Instead, he supplied a credit report obtained under #7086 and

pointed out that it did not reveal the existence of two social security numbers in his name.[69]  This

glaring omission caused Elliott to formally assert the defense of mistaken identity in his Motion to

Set Aside Foreign Judgment.[70]

---

[67]  Exh. 1.

[68]  Exh. 54.

[69]  *Id.*

[70]  Exh. 44 and 45.

Once Debtor's deception was exposed in this Court, Debtor tried to extricate himself by blaming Elliott.  In his testimony, Debtor denied telling Elliott that he was not New Falls' borrower.[71]  Debtor's position is one of semantics.  Elliott questioned Debtor about the existence of two social security numbers on his credit report.  Debtor responded directly to the question asked, supplying a credit report that merely refuted New Falls' assertion that his credit report had two social security numbers. While this was a correct response to the question asked, in so answering, Debtor evaded admitting to the real point of the inquiry.  Debtor knew that by responding to Elliott's question strictly as asked, he would create the impression that he did not have two social security numbers.  Since the number he claimed, #7086, did not match New Falls' credit application (taken under #1774) it was logical for Elloitt to assume this was a case of mistaken identity.

Debtor asserted on the witness stand that the mistaken identity defense used by Elliott was without his knowledge or direction.[72]  However, at the hearing on the Motion to Convert, copies of email correspondence between Debtor, Elliott, and Slomiak were produced.[73]  In the emails, Debtor, Elliott, and Slomiak discuss Debtor's defense of mistaken identity and obtaining sanctions in the form of attorney's fees against New Falls for its failure to voluntarily vacate its Default Judgment in light of this obvious mistake.[74] Debtor also presumably remained silent after receiving Slomiak's letter demanding that New Falls immediately cease collection efforts because the Debtor was not

---

[71]  Tr.T. 107:22-109:3.

[72]  Exh 1; Tr. T. 75:18-77:21; 80:17-81:6.

[73]  Exh. 54 and 55.

[74]  Exh. 55.

16

the same person that owed New Falls on its loan.[75]   By failing to correct the misrepresentations set

out by his counsel in the letter to New Falls, the Motion to Set Aside Judgment, and the email

discussion on the availability of sanctions, Debtor committed an affirmative fraud on his counsel,

at lease one state court, and New Falls.[76]

It is apparent that Debtor intentionally misled Bank of America, New Falls, Elliott, and the

Louisiana state court regarding his identity.  He has continued this conduct, attempting to deceive

this Court, his creditors, and Trustee with regard to the existence of two social security numbers, the

extent of his assets, and the status of his residency.  Debtor's lack of honesty is evidence that the

Motion to Convert was not filed in good faith.  Additionally, this Court is of the opinion that having

delayed New Falls' collection efforts for at least seven years,  Debtor filed this case in an effort to

avoid the ultimate day of reckoning.

### 4. 2007 Bankruptcy

In his Petition and Schedules, Debtor failed to disclose his 2001 Bankruptcy,[77] a number of

bank accounts, an undeposited check for $25,184.72, outstanding accounts receivable, his second

social security number, and a closed account at Bank of America.  Debtor took additional steps to

conceal, move, spend, or otherwise hide his assets once the Trustee and New Falls discovered the

existence of his undisclosed assets.

---

[75]  Exh. 1.

[76]  *Supra,* at 11-12; Exh. 54, 55; Tr.T. 82:4-84:21; 88:22-89:10.

[77]  Debtor's counsel admitted that it was scrivener's error to omit the 2001 Bankruptcy. However, Debtor
stated that he reviewed the Schedules before filing them and apparently did not bring the omission to counsel's
attention.  In any event, this is the only error that the Court finds was not committed in bad faith.

### a.  The Vanguard and WNB Accounts

Debtor's deception begins with an undisclosed, and recently closed, Vanguard account.  A week prior to his filing, the Vanguard account contained $25,181.10.[78]  On March 7, 2007, Debtor closed the account and requested the balance in the form of a check.[79]  Vanguard issued a check for $25,184.72, which Debtor held on the Petition Date.[80]

In April 2007,  Trustee discovered the Vanguard account, and on April 19, 2007, Trustee wrote Vanguard requesting that the account be frozen.[81]  At some point, Debtor admitted to his counsel that he had a check for the account's balance in his possession.  Debtor testified, and Claude Lightfoot ("Lightfoot"), his bankruptcy counsel, confirmed, that during a meeting in April 2007, Debtor showed Lightfoot the uncashed check for $25,184.72.  Initially, Debtor gave Lightfoot the check, and Lightfoot held it.[82]

Later, Lightfoot returned the check to Debtor, although the exact date of this transaction is not clear.[83]  Also unclear is what advice Lightfoot offered Debtor when he returned the funds to

---

[78]  Exh. 31.

[79]  Tr.T. 250:2-253:14.

[80]  Tr. T. 52:19-24.

[81]  Exh. 15.

[82]  Tr.T. 55:25-57:10.  Under questioning by Lightfoot, it appears that at meeting in April 2007, Debtor told Lightfoot about the check and the Vanguard account, signed Amended Schedules, and left Lightfoot in possession of the check.  *See* FN 84, *infra*.

[83]  Based on Lightfoot's and Debtor's admissions in court, Lightfoot received the check in April of 2007, held it for a period, then returned it to Debtor at some point on or before April 24, 2007.  *See*, FN 82, *supra*; 84, 85,and 90, *infra*.

him.[84]  In any event, Debtor deposited the check into the still undisclosed WNB account on April

24, 2007.

    After discussing the existence of the $25,184.72 check, both Lightfoot and Debtor agreed

that  Debtor's best course of action was to file the present Motion to Convert.  *Despite both*

*Lightfoot and Debtor's knowledge of the uncashed check on or before April 24, 2007, the*

*amendment to Debtor's Schedules disclosing its existence was not filed until May 15, 2007, at least*

---

    [84]  During the hearing on this matter the following exchange occurred between Debtor, Lightfoot, and the
Court:
    Q [Lightfoot]: And how did it come that you did not disclose those funds [previously held on deposit at
Vanguard] in your Chapter 7 Schedules?
    A [Debtor]:  Because those monies in my view were spent already and, therefore didn't have to be listed.
That was my understanding.
    Q.  And what where [sic] those funds allocated to be spent for?
    A.  For the camera equipment for- in order to make the film.
    Ct.  Whait a minute, there's a differnce–why were they spent?
    A.  They were spent because they were allocated to buy the film equipment that I needed to make the film.
    Ct.  Okay, in your mind you were allocating them for that.
    A.  Yes.
    Ct.  Where were the funds physically located?
    A.  Physically they were located —when I filed or when?
    Ct.  When you filed.
    A.  When I filed they were in–they were in a check.
                        *        *        *
    A. ...What I did was I took the check and I had a session and I took the check and I gave up the check.
    Ct.  You "had a session," what do you mean you "had a session"?
    A.  I gave up the check to–
    Ct.  To who?
    A.  My counsel.
    Ct.  Okay, so you gave the $25,000 check to Mr. Lightfoot?
    A.  Yes
    *        *        *
    A. ...Well, he doesn't have it because he gave it back to me when we decided that we were going to file a
Chapter–we're going to try to get a conversion to a Chapter 13...
    *        *        *
    Q.  Okay, *now in order to cure your need to have spent those monies*, you did ask me for the check back,
correct?  (Emphasis supplied)
        A.  Yes.
    Q.  And you at the same time decided that the only way to remedy this situation was to convert to Chapter
13, correct?
        A.  Yes.
Tr. T. 52:4-24, 57:1-10, Tr.T 60:18-20, 63:6-11.

*three (3) weeks after Lightfoot returned the check to Debtor.*[85]  It also appears that in the interim,

the Trustee was not otherwise made aware of the check, the Vanguard account, or the WNB account

by Debtor or his counsel.  Filed simultaneously with the Amended Schedules was the instant Motion

to Convert.  Debtor initially requested conversion *ex parte,* presumably hoping the relief requested

would render moot any inquiry into Debtor's activities.  Instead, the Court set the matter for

hearing.[86]

Because this Motion was not granted *ex parte*, two days later, on May 17, 2007, Debtor's

§ 341(a) meeting of creditors was held.[87]  During the meeting, Debtor was represented by Lightfoot.

Trustee questioned Debtor about the Vanguard account and the funds it contained.  Debtor admitted

withdrawing the funds and holding them in the form of a check, but he and his counsel represented

that the funds had since been "spent."[88] Debtor represented that postpetition, the $25,184.72  had

---

[85]   The following is an exchange that occurred between Lightfoot and Debtor:

Q.  You also had an–well, when you told me [about the Vanguard check] did you sign an Amendment to
your Schedules and disclosed that you had had the $25,000 check?

A.  Yes.

Tr.T. 61:7-13.  The above exchange indicates that Debtor signed his Amended Schedules when he first met with
Lightfoot and disclosed the existence of the Vanguard check.  Both Lightfoot and Debtor admitted that Lightfoot
then held the check for some time, returning it on Debtor's request when they decided to convert the case to a
Chapter 13.  Lightfoot represented that the check was given to Debtor to satisfy his "need to have spent those
monies," presumably prior to the § 341(a) meeting of creditors and conversion of the case. Tr. T. 63:6-7.

[86]   Objection to the Motion to Convert was immediately filed by New Falls.  Docket no. 21.

[87]   The § 341(a) meeting of creditors was originally scheduled for April 19, 2004, but was continued until
May 17, 2007, at Debtor's request.  Docket nos. 2 and 11. The proceeding memo of the meeting conducted on May
17, 2007, provides that the meeting was not concluded, but was continued to June 28, 2007.  Docket no. 23.  The
June 28, 2007, continued meeting was then rescheduled for July 26, 2007, at Debtor's request.  Docket no. 45.  The
proceeding memo filed by  Trustee following  the meeting on July 26, 2007, states that neither the Debtor nor his
attorney appeared.  Docket no. 52.

[88]   Tr. T. 182:14-19.

paid outstanding bills for homeowner's insurance, property taxes, a car repair, and the purchase of film equipment.[89]

In fact, the bills itemized by Debtor were either paid long before his Petition Date or after his § 341(a) meeting.[90]  As of May 17, 2007, the date of the § 341(a) meeting of creditors, Debtor still held at least $21,944.54 of the original $25,184.72 in his accounts.[91]  When questioned about where he deposited the Vanguard check, Debtor indicated WNB.[92]  He did not disclose that shortly thereafter he had rewired $20,000.00 of those funds back to Vanguard where they remained on deposit.  Instead, he fraudulently maintained that he had "spent" the money.[93]

Following the § 341(a) meeting of creditors, Trustee moved for turnover of the funds in the previously undisclosed WNB account.  At the time, the account held $7,300.00 which was ultimately deposited into the registry of this Court.  In the meantime, and just hours after leaving the meeting of creditors, Debtor contacted Vanguard in an effort to remove the rewired funds ($20,000.00) before the Trustee could discover them.[94]  Because the WNB wire had not yet cleared, Debtor's immediate effort was thwarted, but shortly thereafter, he wrote checks to Packaging Services Co.,

---

[89] Tr.T. 174:23-175:10.

[90] Exh. 28; Tr.T. 175:16-21; Exh. 27; Tr.T. 178:2-11; Tr.T. 179:13-180:5.

[91] On or about April 24, 2007, Debtor deposited the Vanguard check into WNB.  Exh. 17. On May 11, 2007, he wired $20,000.00 of those funds back to Vanguard.  Exh.. 30, 31.  As of May 17, 2007, Debtor's balances in Vanguard and WNB totaled $40,390.69.

[92] Tr. T. 182:2-13.

[93] Tr.T. 182:14-21.

[94] Tr.T. 210:18-216:5.

Inc. (for $15,090.00 on May 25, 2007) and an unknown payee (for $4,954.11 on June 13, 2007) exhausting all amounts on deposit.[95]

Following the § 341(a) meeting, the Trustee obtained additional bank statements on Debtor's WNB and Vanguard accounts. The statements, when read together, exposed Debtor's deception regarding his alleged expenditure of funds.[96] When questioned at the hearing on this Motion to Convert, Debtor admitted that the amounts held in the Vanguard account had not actually been spent at the time of his § 341(a) meeting, at least not "spent" as is typically used in the common vernacular. Debtor testified that the funds were "spent" in his mind because he had committed to produce a documentary film and had decided to purchase camera equipment necessary for its production.[97] Debtor testified that his mental commitment to buy camera equipment constituted an expenditure of funds.

If the Court were inclined, which it is not, to believe that Debtor's mental purchase of film equipment constituted an exhaustion of funds, why did Debtor need to liquidate and hold those funds in check form? Why if Debtor believed that the mental allocation of funds legally removed them from his estate (and excused disclosure on his SOFA), would it matter that the funds were on deposit in an account or held by check?

When questioned on this point, Debtor provided a perplexing and totally incredulous explanation. According to Debtor, as long as the funds were at Vanguard, they could not be used

_____

[95] Exh. 31. Trustee had to obtain copies of Debtor's financial statements from WNB and Vanguard as Debtor failed to produce statements on his accounts for the relevant time periods. Based on Debtor's representation at his § 341(a) meeting of creditors that the funds had been spent, Trustee did not seek an immediate attachment or turnover of the accounts.

[96] Exh. 17, 18, 31.

[97] Tr.T. 179:12-180:5.

to pay bills.[98]  Debtor's answer, like his previous ones, is a blatant lie.  Debtor not only had check writing privileges on his Vanguard account, he had utilized those privileges in the past to make other purchases and pay bills.[99]

The facts are that on March 14, 2007, one day before filing, Debtor contacted Vanguard to verify that a check for $8,594.50 had cleared his account and to ask how long the second check he held for $25,184.72 would remain valid.[100]  On the call, he referenced for the account representative the notation on the face of the check that it would be void if not cashed within six months.[101] Debtor's inquiry reveals that he had no present intention of depositing these funds until after his plan was confirmed and scrutiny of his assets would wain.[102]  It was only after the Trustee discovered the Vanguard account, and Debtor had to account for the funds it held, that he deposited them first into WNB, then back to Vanguard, and blatantly spent them.[103]

### b.  Accounts Receivable from Smith and Hawkins

Debtor's fraud with regard to the Vanguard account is not his only deception.  Debtor also failed to disclose the existence of accounts receivable owed to him by Smith and Hawkins in

---

[98]  Tr.T. 53:14-55:22.

[99]  Tr. T. 196:3-10; 196:25-198:5; 198:22-199:2.

[100]  Tr. T. 204:11-207:22.

[101]  Tr. T. 207:11-21.

[102]  Tr.T. 201:18-202:13.  Debtor testified that his prior experience in chapter 13 led him to believe that his plan would be confirmed and his case "over" within ninety days of filing.

[103]  Debtor was warned at his § 341(a) meeting that any amounts held must be turned over to the Trustee. Despite holding $40,390.69 on May 17, 2007, he spent virtually every dime shortly thereafter, including $21,944.54 of the original $25,184.72.

23

connection with his business activities.[104]  Debtor summarily explained this omission as, "I keep lousy books."[105]

Debtor's assertion that he did not know exactly how much Smith and Hawkins owed him on the Petition Date might be believable, but Debtor's failure to disclose the existence, or even the possibility, of accounts receivable on his Schedules is inexcusable.  Debtor compounded this deception when he failed to correct his prior omissions on his Amended Schedules two months later and after postpetition collections on prepetition receivables had occurred.

The relevant facts are that Smith and Hawkins paid Debtor $7,428.00 which he deposited into his WNB account on March 26, 2007.[106]  Debtor's testified that Smith and Hawkins paid net thirty days.  Therefore the Court finds that deposit was related to prepetition sales.[107]  When the Amended Schedules were filed, Debtor failed to include this receivable even though he was now aware that it existed on the Petition Date.

Debtor's § 341(a) meeting was held two days after he filed his Amended Schedules.  Again, he failed to correct his omissions regarding accounts receivable even under direct questioning from Trustee.   At the § 341(a) meeting of creditors, Debtor affirmatively represented that he had no outstanding accounts receivable and did not hold any uncashed checks in payment of receivables on the Petition Date.[108]

---

[104]  Tr.T. 151:16-24.

[105]  Tr.T.152:16-20.  If Debtor's memory was so fleeting, a simple review of his WNB bank statement would have made the matter clear.

[106]  Exh. 18.

[107]  Tr.T. 152:3-7.

[108]  Tr.T. 128:8-22.

In conclusion, the combination of these omissions allowed Debtor to conceal the existence of at least $7,428.00 in estate property.  By the time the WNB account was seized by the Trustee, only $7,300.00, rather than $14,512.26, was recovered.  The deception might have worked but for the fact that Debtor's multiple lies caused extensive discovery by the Trustee.[109]

### c.  Capital One Account

In his Schedules, Debtor disclosed a single depository account at Capital One with a scheduled balance of $100.00.  In fact the account held $2,032.95 on the Petition Date.  Debtor explained that at the time he signed his Schedules, he believed that checks written prepetition had cleared leaving a balance of only $100.00.  However, by the time the Amended Schedules were filed, Debtor had received his monthly bank statement and undeniably knew, or should have known, that the account balance on the Petition Date was actually higher.[110]  Yet, Debtor did not choose to correct this error when he had the opportunity.

The Court also notes that Debtor's March bank statement on this account reflects a sizable, unexplained withdrawal of $6,361.55 the day before Debtor filed bankruptcy.[111]  While the Court will not speculate  as to the propriety or impropriety of this withdrawal at this point in time, given Debtor's conduct, further explanation and accounting for these funds will be required by the Court.

---

[109]  Since Debtor maintained that the Petition Date balance on the account was $7,229.26, the Trustee's receipt of $7,300.00 in seized funds initially appeared to net at least the amounts on deposit in that account.

[110] Exh. 19.

[111]  *Id.*

### d. Exemptions

Finally, Debtor has claimed California exemptions in his Schedules, most notably a California homestead exemption against his Louisiana residence. Debtor asserts through his Petition and his testimony at the hearing on the Motion to Convert that he did not subjectively decide to become a permanent resident of Louisiana until sometime after Hurricane Katrina occurred, on August 29, 2005. When exactly after August 2005 Debtor "decided" to reside in Louisiana is ambiguous.[112] Debtor maintains that he was a California resident at all times prior to this "subjective" decision.

Debtor's new insistence that he was not a Louisiana resident until after August 2005 is simply incongruous with the prior positions he has taken or the facts of this case. Debtor has lived in Louisiana since October 2004.[113] Debtor purchased a home in New Orleans in March 2005.[114] His mortgage application, signed in March 2005, represents that the home will be his "primary residence."[115] Debtor neither owned nor leased property in California, nor did he own or lease property in any other state, from October 2004 to date.[116]

If these facts are not sufficient to establish residency, Debtor's own affidavit sworn under penalty of perjury and filed into the record of the California state court proceeding in connection

---

[112]   Debtor testified that only after becoming an election commissioner after Hurricane Katrina did he subjectively decide to become a Louisiana resident. When the election was held and when Debtor was commissioned was not offered into evidence. Tr.T. 38:1-39:23.

[113]   Tr.T. 35:19-22.

[114]   Exh. 59.

[115]   Exh. 24.

[116]   Tr.T. 40:9-12.

with the New Falls litigation ends the inquiry. On September 8, 2006, Debtor represented that he had not been a resident of California *since November 2004, had not maintained a residence in California since November 2004, and lived continuously in New Orleans, Louisiana, since November 2004.*[117] The affidavit was filed into the record of the state court on September 11, 2006, approximately six months prior to the Petition Date. This affidavit is directly contrary to Debtor's present position that he was not a Louisiana resident until sometime after August 29, 2005. It is obvious to this Court that Debtor's present position is designed to take advantage of an exemption to which he is clearly not entitled.[118]

The Court finds Debtor's actions duplicitous and fraudulent. Taken alone, any one of the above described actions would be sufficient to establish Debtor's bad faith. When considered together, the evidence is overwhelming.

### B. Other Factors

While the above events and facts provide irrefutable evidence of bad faith, the Court will briefly consider some of the other factors set out in *Piccoli* for completeness sake. First, the Court notes that Debtor has neither filed nor submitted a proposed chapter 13 plan, nor has he provided financial records to demonstrate that he has sufficient income to support any plan that he might propose. At the hearing on this matter, Debtor represented that if allowed to convert, he would file a sixty month plan paying the value of all non-exempt estate property existing on the Petition Date

---

[117] Exh. 44, 45, 46.

[118] California exempts $125,000.00 of a homestead's value from the bankruptcy estate. Louisiana's $25,000 exemption is far less generous.

27

up to the total payment of all allowed claims.[119]   Based on the evidence submitted, the Court finds this proposal both unlikely and unfeasible.

Debtor's tax returns for the last three years and Schedules I and J reflect gross income from social security and business  sales of $2,127.00 per month on average.  His net income after expenses is negative.[120]  Debtor held cash and receivables of at least $41,000.00 on the Petition Date. He also had $53,000.00 in equity in his home, presuming the Court takes into account a $25,000.00 Louisiana homestead exemption.   Therefore, assuming for the sake of argument that Debtor only has a limited number of creditors to satisfy, on the Petition Date, Debtor held sufficient cash to pay allowed claims in full.  Now, after he has spent or concealed almost all his cash, it appears unlikely that creditors can be paid from remaining assets.

While Debtor claims that he will give creditors a lien on his home to secure his promise to repay in a chapter 13, this asset is encumbered by a first mortgage with a balance of $223,000.00. The monthly notes are $1,385.36.  Shortly after the hearing on this Motion to Convert, Wells Fargo requested and received relief from the stay due to Debtor's default.[121]  Given his negative income, it is unlikely that this situation will be remedied.  Therefore, it is unlikely that Debtor's home will provide any security against Debtor's failure to perform in the future.

Not only is the Court unconvinced that Debtor can or will complete his  fictional plan, but creditors may lose valuable rights in the interim should a conversion be allowed and Debtor subsequently default.  As the bankruptcy case now stands, Trustee has the right to file certain

---

[119]   Debtor has offered to waive his homestead exemption in support of this proposal.

[120]   Schedules I and J; Exh. 3,4,5,6; Tr.T. 42:13-23.

[121]   Docket nos. 80 and 84.

preference, turnover, fraudulent conveyance, and other avoidance actions to recover prohibited prepetition and postpetition transfers of property. The success of those actions may obtain for creditors the only actual recovery available. A conversion would protect those transactions from prosecution while Debtor promises to pay. After a period of time, any attempt to bring those actions may be foreclosed despite the fact that creditors remain unsatisfied.

In addition, the Court is unconvinced that Debtor has seen the error of his ways. He remains defiant, unremorseful, and totally self-absorbed. Nothing in his testimony convinces the Court that Debtor even acknowledges that he has done anything wrong, much less will make an honest effort to right the wrongs he has perpetrated.

The Court finds that Debtor has neither proposed a confirmable plan nor has the income to make any plan feasible. The Debtor has few, if any, estate assets to protect given the Court's lifting of the stay as to his home. The Court finds that the impact on Debtor in denying conversion is, for these reasons, minimal, especially when compared to the prejudice that granting the Motion to Convert would cause his creditors.

Finally, the Court has no desire to give Debtor another opportunity to abuse the bankruptcy process. If allowed to convert, the Court is confident that Debtor would find new ways to delay payment to creditors, hide assets, or otherwise take unfair advantage of opportunities intended for the "honest but unfortunate debtor."[122]

### IV. Summary

In summary, Debtor did not meet the burden of showing that the Motion to Convert to Chapter 13 was filed in good faith. Debtor has concealed assets, squandered opportunities to pay

---

[122] *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659 (1991).

29

creditors,  used two social security numbers to evade creditors, and claimed exemptions to which he is not entitled.  Along the way, Debtor has made false statements under oath and used the shield of bankruptcy's automatic stay to move assets beyond Trustee and creditors' reach.  Debtor has not shown that he can fund a chapter 13 plan, and there is no reason to believe that conversion would benefit his creditors.  In fact, this Court is hard-pressed to find anything in the record that would support Debtor's position that he is an honest Debtor who is interested in repaying his creditors.  Accordingly, the Motion to Convert is denied.

A separate Order will be entered in accordance with these Reasons for Decision, and this matter will be referred by the Court to the United States Attorney for criminal investigation.

New Orleans, Louisiana, February 27, 2008.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge